UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TERESA TUMBLIN,<br><br>Plaintiff,<br><br>v.<br><br>MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES,<br><br>Defendant. | No. 19-cv-2204 ZMF |

### MEMORANDUM OPINION

Plaintiff Teresa Tumblin brings this action against Attorney General Merrick Garland[1] for violating the antiretaliation provision of Title VII of the Civil Rights Act of 1964 ("Title VII"), codified at 42 U.S.C. § 2000e3(a). Tumblin, an employee of the Federal Bureau of Investigation ("FBI"), alleges that Defendant did not select her for positions in December 2015 and February 2016 in retaliation for Tumblin's complaints that she was subjected to a hostile work environment. Pending before the Court is Defendant's Motion for Summary Judgment, which the Court will GRANT.

---

[1] Attorney General Garland is the proper defendant in this case. *See* 42 U.S.C. § 2000e-16(c).

**I.     BACKGROUND**

    A.     <u>Factual Background</u>[2]

        1.     *FBI Employment and Prior Protected Activity*

On June 8, 2008, Tumblin began working as a Research Analyst for the FBI. *See* Pl.'s Resp. to Def.'s Statement of Material Facts Not in Dispute ("Pl.'s Resp.") 26, ECF No. 38. In 2009, Tumblin asserted her first Equal Employment Opportunity ("EEO") claim, which was resolved through mediation. *See* Second Am. Compl. 4, ECF No. 15. In March 2015, Tumblin filed her second EEO complaint alleging a retaliatory hostile work environment. *See* Pl.'s Mem. in Opp'n to Def.'s Partial Mot. to Dismiss, Ex. 2, Compl. of Discrimination 2–4, ECF No. 12-3. On July 11, 2019, the Department of Justice's Complaint Adjudication Office determined that the FBI did not subject Tumblin to a retaliatory hostile work environment. *See* Def.'s Mot. for Summ. J., Ex. 2, FBI-2015-00091 15–17, ECF No. 37-4.

        2.     *December 2015: Denial of Reassignment to the White House Special Events Handling Unit*

Tumblin's first claim concerns the FBI's National Name Check Program (the "Program"), which conducts name checks for over fifty federal partners for various purposes. *See* Pl.'s Resp. at 32. Name check work consists of two functions: name searches and dissemination. *See id.* Name search technicians, generally at the GS-9 level,[3] conduct name searches. *See id.* Other employees

---

[2] Tumblin failed to fully comply with Local Civil Rule 7(h)(1) and the Court's Standing Order, which required her to "submit a statement enumerating all material facts which [she] contends are genuinely disputed" and to "furnish precise citations to the portions of the record on which [she] rel[ies]." Standing Order in Civil Cases 6, ECF No. 33; *see* LCvR 7(h)(1). As such, the Court will accept as true facts in Defendant's statement of facts that are uncontested by Plaintiff and uncontroverted by the evidence. *See Burke v. Gould*, 286 F.3d 513, 517–18 (D.C. Cir. 2002).

[3] The FBI largely pays employees on the General Schedule ("GS") pay scale, which has fifteen levels. *See* Salary Table 2022-GS, OPM.GOV, https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2022/GS.pdf.

conduct dissemination wherein they analyze the name check results and draft reports. *See id.* Dissemination requires analytical skills and is more challenging than name checking. *See id.* at 33.

In December 2015, the FBI consolidated the name search teams within the Program into the White House Special Events Handling Unit (the "Unit"). *See id.*; Second Am. Compl. at 8. The new teams within the Unit would conduct name searches, not dissemination. *See* Second Am. Compl. at 8. On December 8, 2015, Tumblin expressed interest in assignment to the Unit. *See* Def.'s Mot. for Summ. J., Ex. 7, Email from James M. Gobble to James P. Flanigan ("Gobble Email") 2, ECF No. 37-9. On December 21, 2015, Defendant formally announced the creation of the Unit. *See* Def.'s Mot. for Summ. J., Ex. 3, Email from Brian Oxendine 57, ECF No. 37-5. Tumblin sought a supervisory role within the new Unit, *see* Gobble Email at 2; Def.'s Mot. for Summ. J., Ex. 5, Dep. of Teresa Tumblin ("Tumblin Dep.") 24, ECF No. 37-7, but no such position existed, *see* Def.'s Mot. for Summ. J., Ex. 4, Dep. of Brian Oxendine ("Oxendine Dep.") 134–36, ECF No. 37-6. In fact, reassignment would not have resulted in a promotion or salary increase. Pl.'s Resp. at 37.

Assistant Section Chief Brian Oxendine, in consultation with Section Chief Kevin Donovan, reassigned employees to the Unit. *See* Def.'s Mot. for Summ. J., Ex. 8, Decl. of Kevin C. Donovan ("Donovan Decl.") 8, ECF No. 37-10. Donovan and Oxendine became aware of Tumblin's prior EEO activity in early 2015 and late 2015, respectively. *See* Donovan Decl. at 5; Def.'s Mot. for Summ. J., Ex. 6, Decl. of Brian Oxendine ("Oxendine Decl.") 4, ECF No. 37-8. On December 22, 2015, James P. Flanigan, the Unit Chief of the Unit, announced the assignments to the Unit. *See* Def.'s Mot. for Summ. J., Ex. 11, Email from James P. Flanigan ("Flanigan Email") 3, ECF No. 37-13. Employees transferred to the Unit were all GS-9s and below. *See* Oxendine Dep. at 136. Oxendine did not select Tumblin. *See* Flanigan Email at 2–3. At the time,

Tumblin was a GS-12 research analyst with previous experience in dissemination. *See* Tumblin Dep. at 27. Oxendine determined that the FBI needed Tumblin's skills on the Program's dissemination team to reduce a backlog. *See* Oxendine Dep. at 34–36. Although Tumblin had not performed dissemination as her primary responsibility for three years, *see* Pl.'s Resp. at 37, she was skilled at it, *see* Tumblin Dep. at 16. Tumblin asserts that the denial of her reassignment request was in retaliation for her prior EEO activity. *See* Second Am. Compl. at 16.

        3.    *March 2016: Non-Selection to Quality Assurance Reviewer Rotational Program*

Tumblin's second claim concerns work as a Quality Assurance ("QA") Reviewer. *See* Second Am. Compl. at 18–19. In January 2016, the Program's Quality Resources Management Unit posted a vacancy for a one-year detail on the QA Team. *See* Def.'s Mot. for Summ. J., Ex. 10, Email from Brian Oxendine ("Oxendine Email") 2–3, ECF No. 37-12. Applicants had to submit a one-page narrative describing their qualifications and letters of recommendation from a supervisory research analyst and unit chief. *See id.* at 3. Mandatory qualifications included: serving in a current research analyst position; a minimum of two years of experience conducting name checks; proficiency and experience in conducting dissemination; and a willingness to change or adjust one's schedule to meet the QA requirements. *See id.* Preferred qualifications for the role included excellent or outstanding quality ratings and a high level of productivity as evaluated by the section's metrics. *See id.*

In February 2016, Tumblin applied for the one-year detail. *See* Second Am. Compl. at 8. Selection would not have resulted in a promotion or salary increase. *See* Pl.'s Resp. at 49. On March 1, 2016, a panel of four unit chiefs—Ken Strother, Mark Vaughn, Lisa Foster, and Dale

Roland—recommended the selection of five QA Reviewers out of nine applicants.[4] *See* Pl.'s Resp. at 42. Strother, Vaughn, and Foster were aware of Tumblin's past EEO activity. *See* Def.'s Resp. to Pl.'s Statement of Disputed Material Facts ("Def.'s Resp.") 30–31, ECF No. 39-1. Roland was not. *See id.* at 30; Pl.'s Resp. at 56. The panelists scored the candidates in three areas: subject matter knowledge; interpersonal ability; and submission content. *See* Def.'s Mot. for Summ. J., Ex. 22, Individual Rating Forms, ECF No. 37-24. Scores were from 0–5, ranging from "Not Demonstrated" to "Exemplary." *See id.* One panelist, Foster, crossed out Tumblin's score of three 4s and changed it to three 3s. *See* Mem. of Law in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), Ex. 5, Individual Rating Form for Teresa Tumblin ("Tumblin's Ratings") 3, ECF No. 38-5. After the panelists combined their scores, Tumblin ranked seventh out of eight. *See* Rotational Board Final Decision at 2. Tumblin received an aggregate score of fifty-seven points. *See id.* The top six candidates scored in the seventies. *See id.*

Following the panelists' scoring, Donovan re-ranked the candidates based on different criteria. *See* Def.'s Mot. for Summ. J., Ex. 15, NNCP QA Rotation Selections 2, ECF No. 37-17. Donovan gave preference to those who had not previously served as QA reviewers and who had not recently participated in a rotational program "to enable more analysts to gain experience." *Id.* Once again, Tumblin ranked seventh out of eight. *See id.* at 3. Tumblin's placement was in part informed by her productivity score of .86, which was considered "minimally successful." Def.'s Mot. for Summ. J., Ex. 28, Addendum for Achieving Results 2–4, ECF No. 37-30; *see* Def.'s Mot. for Summ. J., Ex. 27, Table of Applicants' Qualifications 2, ECF No. 37-29. Accordingly, Tumblin

---

[4] The panelists eliminated one candidate for not meeting the mandatory qualifications. *See* Def.'s Mot. for Summ. J., Ex. 24, Rotational Board Final Decision 2, ECF No. 37-26. The panelists initially determined that Tumblin also did not meet the mandatory qualifications. *See id.* However, Defendant later revised these qualifications, which made Tumblin eligible. *See* Donovan Decl. at 6–7.

5

did not meet the preferred qualifications for the QA Reviewer position. *See* Oxendine Email at 2–3. Donovan's rankings were also informed by Tumblin's previous work as a QA Reviewer and participation in a rotational program; three of the candidates did not have experience in one or both of these categories. *See* NNCP QA Rotation Selections at 2.

On March 3, 2016, Donovan extended offers to the top five candidates. *See id.* at 2–3. Tumblin did not receive an offer. *See id.* On January 25, 2017, Defendant selected Tumblin for the QA Reviewer rotational program to fill a vacancy because she was the next ranked candidate on the list. *See* Def.'s Mot. for Summ. J., Ex. 29, Email from Kevin Donovan to Teresa Tumblin 3, ECF No. 37-31. Tumblin asserts that her initial non-selection was in retaliation for her prior EEO activity. *See* Second Am. Compl. at 9.

B.   Procedural History

On July 24, 2019, Tumblin filed this suit. *See* Compl. 12, ECF No. 1. On October 15, 2019, and March 10, 2020, she filed amended complaints. *See* Am. Compl., ECF No. 3; Second Am. Compl. On December 3, 2020, Judge Dabney L. Friedrich dismissed three of the five counts in Tumblin's Second Amended Complaint for failure to state a claim. *See* Mem. Op. 7–13, ECF No. 21. On January 5, 2022, the parties consented to proceed before a U.S. Magistrate Judge for all purposes. *See* Min. Order (Jan. 5, 2022). Following discovery, Defendant moved for summary judgment on the two claims identified above. *See* Def.'s Mot. for Summ. J. 1, ECF No. 37.

## II.   LEGAL STANDARD

To succeed on a motion for summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a). A fact is material if it "might affect the outcome of the suit under governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial burden of demonstrating that there is no genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the nonmoving party must identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). In evaluating motions for summary judgment, the Court must review all evidence in the light most favorable to the nonmoving party and draw all inferences in the nonmoving party's favor. *See Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014). In doing so, the Court must not assess credibility or weigh the evidence. *See Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013). However, the nonmoving party "may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence[.]" *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872–73 (8th Cir. 2005)). A genuine issue for trial must be supported by affidavits, declarations, or other competent evidence. *See* Fed. R. Civ. P. 56(c). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50.

### III. DISCUSSION

Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII]" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). "The role of the antiretaliation provision is to prevent employer interference with unfettered access to Title VII's remedial mechanisms." *Chambers v. Dist. of Columbia*, 35 F.4th 870, 877 (D.C. Cir. 2022) (cleaned up). If a plaintiff cannot present

7

direct evidence of retaliation, the court assesses her claims under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

Under that framework, the employee must first make out a prima facie case of retaliation. *See Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019). To do so, the plaintiff must show that (1) "[s]he engaged in statutorily protected activity;" (2) "[s]he suffered a materially adverse action by h[er] employer;" and (3) "a causal link connects the two." *Id.* at 574. Next, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its action. *See McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012). In doing so, "the employer must 'articulate specific reasons for that applicant's qualifications such as seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination of such criteria.'" *Figueroa v. Pompeo*, 923 F.3d 1078, 1089 (D.C. Cir. 2019) (quoting *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003)) (cleaned up). If the employer makes this showing, then "the burden-shifting framework disappears." *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004). The "central inquiry" then becomes "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted [non-retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the plaintiff on a prohibited basis." *Iyoha*, 927 F.3d at 566 (quoting *Adeyemi v. Dist. of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)). In other words, the employee must demonstrate "pretext." *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009).

When the employer properly presents a legitimate, non-retaliatory reason for the challenged action, the district court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Because Defendant asserted legitimate, non-retaliatory reasons for the challenged

actions, the *Brady* shortcut applies. *See Barry v. Haaland*, No. 19-cv-3380, 2022 WL 4598518, at *6 (D.D.C. Sept. 29, 2022). Thus, the Court will proceed to step two.[5] *See id.*

  A. <u>Defendant's Legitimate and Non-Retaliatory Justifications</u>

Four factors are "paramount in the analysis" of whether an employer has met its burden: (1) the employer must produce admissible evidence; (2) "the factfinder, if it believe[s] the evidence, must reasonably be able to find that the employer's action was motivated by a [non-retaliatory] reason;" (3) the employer's justification must be "facially credible in light of the proffered evidence;" and (4) the employer must provide a "clear and reasonably specific explanation" for its action. *Figueroa*, 923 F.3d at 1087–88 (cleaned up).

---

[5] Problems abound at step one. Tumblin primarily relies on temporal evidence to establish causation. *See* Pl.'s Opp'n at 15–19. She argues that the proximity between her March 2015 EEO complaint and the December 2015 and March 2016 non-selections establishes but-for causation. *Id.* Although "mere temporal proximity may establish causation," *Keys v. Donovan*, 37 F. Supp. 3d 368, 372 (D.D.C. 2014), to do so, "the temporal proximity must be very close," *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (cleaned up). Indeed, numerous courts have found that three and four-month periods between plaintiffs' protected activity and adverse employment actions were insufficient to establish causation based on temporal proximity. *See id.* at 273–74 (collecting cases).

Tumblin expressed interest in the Unit nine months after her second EEO claim, and the QA Reviewer role two months after that. *See* Second Am. Compl. at 4–8. The nine-to-eleven-month gap between the protected EEO activity and the challenged employment action "is too attenuated to establish causation based on temporal proximity alone." *Clinton v. Granholm*, No. 18-cv-991, 2021 WL 1166737, at *10 (D.D.C. Mar. 26, 2021); *see also Woodruff v. Mineta*, No. 01-1964, 2005 WL 8178045, at *6 (D.D.C. Jan. 3, 2005) ("[A]s a matter of law, nine months is too much time between an adverse action and protected activity to establish causation."), *aff'd in part and rev'd in part on other grounds Woodruff v. Peters*, 482 F.3d 521, 528 (D.C. Cir. 2007); *Kline v. Springer,* No. 07-0451, 2009 WL 10701432, at *2 (D.D.C. June 29, 2009) ("No reasonable juror could find retaliation from these facts [where] there was a time lapse of from five to six months . . . ."). "[Tumblin] has not introduced anything beyond [her] weak evidence of temporal proximity to show that [Defendant's] decisions were motivated by a desire to retaliate against [her]." *Iyoha*, 927 F.3d at 574. Thus, Tumblin likely failed to establish causation. *See Clinton*, 2021 WL 1166737, at *10.

1.  *Denial of Reassignment to the Unit*

Defendant provided legitimate, non-retaliatory reasons for not reassigning Tumblin.

First, Defendant "has supported its justifications with evidence that the Court may consider at summary judgment, including deposition testimony [and] supporting emails[.]" *Arnoldi v. Bd. of Trs.*, 557 F. Supp. 3d 105, 115 (D.D.C. 2021) (cleaned up). This includes sworn statements from Oxendine, Donovan, and Flanigan, and Oxendine's deposition testimony. *See* Oxendine Decl.; Donovan Decl.; Def.'s Mot. for Summ. J., Ex. 9, Decl. of James P. Flanigan ("Flanigan Decl."), ECF No. 37-11; Oxendine Dep. Moreover, Defendant submitted communications related to the reassignment decision. *See* Flanigan Email at 3. Tumblin does not dispute admissibility. *See* Pl.'s Resp.; Pl.'s Opp'n.

Second, Defendant need only "raise a genuine issue of fact as to whether the employer intentionally [retaliated] against the employee" to satisfy its step two burden. *Figueroa*, 923 F.3d at 1087 (cleaned up). Defendant did so. Oxendine did not consider Tumblin for reassignment because Tumblin "had good dissemination metrics." Oxendine Decl. at 6; *see* Oxendine Dep. at 36. Oxendine's deposition testimony detailed the Program's backlog and the decision to not reassign individuals skilled at dissemination to the name search roles within the Unit. *See* Oxendine Dep. at 33–35. Donovan, who consulted Oxendine on which analysts to reassign, similarly stated that research analysts "who were skilled in dissemination were not chosen . . . as they were too valuable to [the Program's] operations performing the more complex dissemination function." Donovan Decl. at 8. Flanigan also explained that they "did not select any employees who had high metrics in dissemination as they were considered more valuable . . . continuing in that function." Flanigan Decl. at 6. In fact, the December 22, 2015 email announcing the reassignments underscored the need to effectively allocate "those who were stronger in the name

search function and [those] who provided the greatest potential for dissemination." Flanigan Email at 3. These statements accord with Oxendine's decision to assign Tumblin to the Program's dissemination team. *See* Donovan Decl. at 8. A factfinder reviewing these statements, "emails[,] and other underlying materials[] could believe the evidence and reasonably conclude that [Defendant] was motivated by the [nonretaliatory] reasons described [therein]." *Clinton*, 2021 WL 1166737, at *8.

Third, an employer's non-retaliatory explanation lacks facial credibility if it is "so internally inconsistent or implausible on its face that a reasonable factfinder could not credit it." *Bishopp v. Dist. of Columbia*, 788 F.2d 781, 786 (D.C. Cir. 1986). This is not the case here. Defendant's numerous statements and documents are internally consistent: Tumblin's strength in dissemination precluded her from consideration for the lesser name check position. *See* Oxendine Decl. at 6. Moreover, Defendant's "[non-retaliatory] explanation [was] at least facially credible in light of the proffered evidence" that the position in the Unit was a lesser role. *Clinton*, 2021 WL 1166737, at *8 (citing *Figueroa*, 923 F.3d at 1088); *see* Oxendine Dep. at 136. In fact, the employees selected for reassignment were all GS-9 or lower, whereas Tumblin was a GS-12. *See* Oxendine Dep. at 136.

Fourth, Defendant's "explanations were sufficiently clear and specific to allow [Tumblin] ample opportunity to bring forward evidence to 'disprove [the] defendant's reasons.'" *Clinton*, 2021 WL 1166737, at *9 (quoting *Figueroa*, 923 F.3d at 1088). Tumblin, a GS-12 research analyst with valuable dissemination experience, was needed in dissemination to help reduce a backlog of work. *See supra*. Tumblin had ample opportunity to claim she was poor at dissemination, that dissemination did not matter to the FBI, or that there was no backlog. But she did not. Indeed, Tumblin admitted that she was skilled at dissemination. *See* Tumblin Dep. at 16.

2. *Non-Selection to the QA Reviewer Rotational Program*

Defendant provided legitimate, non-retaliatory reasons for not selecting Tumblin for the QA Reviewer rotational program.

First, Defendant supported its explanation with admissible evidence. *See Figueroa*, 923 F.3d at 1087. Specifically, Defendant provided Tumblin's application for the QA Reviewer one-year detail; the four panelists' individual scoresheets; communications identifying the vacancies and announcing the applicants ultimately selected; a rubric explaining productivity metrics for different grade levels; sworn statements from Foster, Strother, Roland, and Donovan; and Vaughn's deposition testimony.[6] Tumblin does not challenge the admissibility of this evidence. *See* Pl.'s Resp.; Pl.'s Opp'n.

Second, an employer's decision to hire the "best applicant" for a position is a legitimate, non-retaliatory justification. *Holcomb v. Powell*, 433 F.3d 889, 896 (D.C. Cir. 2006) (cleaned up). "[T]he evidence would allow a reasonable factfinder to conclude that [Tumblin] was not among the highest-scoring candidates eligible for the vacant [QA Reviewer] position[s]." *Albert v. Perdue*, No. 17-cv-1572, 2019 WL 4575526, at *4 (D.D.C. Sept. 20, 2019) (citing *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1182 (D.C. Cir. 1996)); *see* Individual Rating Forms. In fact, Tumblin's productivity metrics were low for her GS level. *See* Addendum for Achieving Results

---

[6] *See* Donovan Decl.; Oxendine Email; Def.'s Mot. for Summ. J., Ex. 14, Teresa Tumblin QRMU Position Application, ECF No. 37-16; NNCP QA Rotation Selections; Def.'s Mot. for Summ. J., Ex. 16, Supervisory Research Analyst and Unit Chief Recommendation for Teresa Tumblin, ECF No. 37-18; Def.'s Mot. for Summ. J., Ex. 17, Rotational Board Final Decision Total, ECF No. 37-19; Def.'s Mot. for Summ. J., Ex. 20, Decl. of Lisa Foster, ECF No. 37-22; Def.'s Mot. for Summ. J., Ex. 21, Decl. of Dale A. Roland, ECF No. 37-23; Individual Rating Forms; Def.'s Mot. for Summ. J., Ex. 23, Dep. of Mark Vaughn, ECF No. 37-25; Rotational Board Final Decision; Def.'s Mot. for Summ. J., Ex. 25, Email to Mark Vaughn, ECF No. 37-27; Def.'s Mot. for Summ. J., Ex. 26, Email from Kevin Donovan, ECF No. 37-28; Table of Applicants' Qualifications; Addendum for Achieving Results.

at 2–4; Table of Applicants' Qualifications at 2. Ultimately, the selecting official chose candidates who, unlike Tumblin, did not have prior experience as a QA Reviewer. *See* NNCP QA Rotation Selections at 2. It was a reasonable business decision for Defendant to prioritize "enabl[ing] more analysts to gain [this new] experience . . . and then bring that experience back to the operational units of [the Program]." *Id.* "Being both reasonable and [non-retaliatory], that is enough to take us to the third step under *McDonnell Douglas*[.]" *Fischbach*, 86 F.3d at 1182.

Third, Defendant's non-retaliatory explanation was "internally []consistent" on its face." *Bishopp*, 788 F.2d at 786. The selecting official offered the vacant QA Reviewer positions to the five candidates who received the "highest [] scores." *Albert*, 2019 WL 4575526, at *4; *see* NNCP QA Rotation Selections at 2–3. Tumblin ranked seventh out of the eight candidates. *See* Rotational Board Final Decision at 2. Furthermore, Defendant selected Tumblin for the QA Reviewer rotational program less than a year later when a vacancy arose because she was the next ranked candidate on the list. *See* Email from Kevin Donovan to Teresa Tumblin at 3. "Defendant's explanation is therefore legitimate." *Albert*, 2019 WL 4575526, at *4 (citing *Figueroa*, 923 F.3d at 1088).

Fourth, Defendant produced a "clear and reasonably specific explanation" for its non-selection of Tumblin. *Figueroa*, 923 F.3d at 1088 (cleaned up); *see* Oxendine Email at 2–3. Defendant set up a selection system with specific rating criteria. *See* Individual Rating Forms; *Albert*, 2019 WL 4575526, at *4. The panelists individually scored the candidates using the same criteria. *See* Individual Rating Forms. Subsequently, Donovan re-ranked the candidates. *See* NNCP QA Rotation Selections at 2–3. Donovan's ranking accounted for Tumblin's "minimally successful" productivity score. *See* Donovan Decl. at 11. Once again, Tumblin ranked seventh out of eight. *See* NNCP QA Rotation Selections at 3. In announcing the selected QA Reviewers,

13

Donovan provided a breakdown of his rankings and the factors he considered in prioritizing candidates. *See id.* at 2–3. "With the scoresheets and precise breakdown [of] the [eight] candidates, [Tumblin] easily could determine which factors she should challenge at the third prong of the *McDonnell Douglas* framework." *Figueroa*, 923 F.3d at 1090.

### B.   Tumblin's Evidence of Pretext

"The burden now shifts to [Tumblin] to provide sufficient evidence by which a reasonable jury could find [Defendant's] stated reason was pretext for [] retaliation." *Albert*, 2019 WL 4575526, at *5 (citing *Brady*, 520 F.3d at 494).

To establish pretext, plaintiffs typically provide evidence of "variant treatment of similarly situated employees, discriminatory statements by decision makers, [or] irregularities in the stated reasons for the adverse employment decision." *Bennett v. Solis*, 729 F. Supp. 2d 54, 60 (D.D.C. 2010). Alternatively, they may show that the defendant provided "a phony reason" for its non-selection. *Hogan v. Hayden*, 406 F. Supp. 3d 32, 46 (D.D.C. 2019) (quoting *Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994)). "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible." *Hogan*, 406 F. Supp. 3d at 46 (quoting *Pignato*, 14 F.3d at 349).

#### 1.   *Denial of Reassignment to the Unit*

The Court is not a "super-personnel department that reexamines an entity's business decisions." *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) (cleaned up). The selecting officials, Oxendine and Donovan, articulated that assignments to the Unit were informed by sound business needs—chiefly, that the Program was experiencing a significant backlog and needed analysts experienced in dissemination to assist. *See* Oxendine Dep. at 33–35. Thus, Tumblin's prior experience on the name search team, which Plaintiff does not contest, *see* Def.'s Resp. at 8–

9, was irrelevant to the business decision of reassignment, *see* Oxendine Decl. at 6; Oxendine Dep. at 36.

Tumblin acknowledges she was a GS-12 research analyst skilled at dissemination. *See* Tumblin Dep. at 16, 27. Further, Tumblin admits that reassignment would not have resulted in a promotion or salary increase. *See* Pl.'s Resp. at 37. Yet she argues that Defendant's reasons for not reassigning her to the Unit were pretextual because she met the qualifications for the role and had not performed dissemination as her primary function for over three years. *See* Pl.'s Opp'n at 20. She relies solely on her sworn statement to establish this. *See* Pl.'s Opp'n, Ex. 11, Decl. of Teresa Tumblin, ECF No. 38-11. This "meager [evidentiary] showing" of only "her own . . . testimony" fails to contradict the reasoning behind Defendant's business decision. *Coleman v. Mayorkas*, No. 18-cv-2268, 2021 WL 930263, at *14 (D.D.C. Mar. 11, 2021).

"A plaintiff can establish pretext masking a [retaliatory] motive by presenting 'evidence suggesting that the employer treated other employees of a different [group] . . . more favorably in the same factual circumstances.'" *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (quoting *Brady*, 520 F.3d at 495). "But to serve as a comparator, the other employee must be 'similarly situated' to the plaintiff." *Clinton*, 2021 WL 1166737, at *11 (quoting *Burley*, 801 F.3d at 301). The individuals reassigned to the Unit—GS-9s and below, *see* Def.'s Resp. at 8—were not comparable to Tumblin, a GS-12, *see* Tumblin Dep. at 27. Because Tumblin "fail[ed] to produce evidence that the comparators were actually similarly situated to [her], an inference of falsity or [retaliation] is not reasonable, and summary judgment is appropriate." *Walker v. McCarthy*, 170 F. Supp. 3d 94, 108 (D.D.C. 2016) (cleaned up).

### 2. *Non-Selection to the QA Reviewer Rotational Program*

"[W]hen an employer seeks to rely on 'fairly administered' process to justify an employment action, the process must in fact be fair. A selection process that relies on numerical scores given by a panel of interviewers is only as fair as the panelists who give the scores." *Iyoha*, 927 F.3d at 570 (quoting *Salazar v. Wash. Metro. Transit Auth.*, 401 F.3d 504, 509 (D.C. Cir. 2005)). A plaintiff may "contend[] that [s]he should have received scores either equal to or higher than the scores given to the candidates selected for the positions. But, unless a 'demonstrably [retaliatory] motive' is apparent, . . . '[t]he Court must respect the employer's unfettered discretion to choose among qualified candidates.'" *Iyoha v. Architect of Capitol*, 282 F. Supp. 3d 308, 331 (D.D.C. 2017) (quoting *Adeyemi v. Dist. of Columbia*, No. 04-cv-1684, 2007 WL 1020754, at *21 (D.D.C. Mar. 31, 2007)) (cleaned up). Tumblin was not the most qualified candidate. She received a lower overall score than six of the other candidates. *See* Individual Rating Forms. Because she was not "significantly better qualified for the job" than the selected candidates, Tumblin cannot establish pretext. *Holcomb*, 433 F.3d at 897.

Tumblin responds by alleging that the panel results were tainted because Foster colluded with other panelists to lower Tumblin's scores. *See* Pl.'s Opp'n at 28. Tumblin's theory is entirely based on her impression of a single piece of evidence: Foster's score sheet. *See* Tumblin's Ratings at 3. The score sheet shows that Foster crossed out Tumblin's score of three 4s and changed them to three 3s, leaving Tumblin with a total score of fifty-seven points. *See* Rotational Board Final Decision at 2. The score sheet provides no indication of when or why Foster made the change. *See id.* And "[Tumblin] may not merely point to unsupported self-serving allegations, but must substantiate [her] allegations with sufficient probative evidence that would permit a finding in [her] favor without resort to speculation, conjecture, or fantasy[.]" *Reed*, 561 F.3d at 790–91

(cleaned up). Despite fulsome discovery, Tumblin has not produced evidence to support her contention. *See* Def.'s Resp. at 15. Regardless, Tumblin would have only received sixty points if she had received the original score of 4s from Foster. *See* Rotational Board Final Decision at 2. A score of sixty would not have changed her seventh-place ranking. *See id.* Additionally, Tumblin does not challenge any of the other panelists' scores, many of which were lower than Foster's scores. *See* Pl.'s Opp'n at 28. As such, a reasonable juror could not infer that the panelists' scoring was pretextual. *See Brady*, 520 F.3d at 497.

Tumblin's fixation on her comparatively low scores for interpersonal skills is unavailing. *See* Pl.'s Opp'n at 6–7, 25–27; Individual Rating Forms. Tumblin argues the four panelists' scores in this category are evidence of pretext because she received "excellent" and "outstanding" scores related to her communication and interpersonal skills in her 2012–2016 performance appraisal reports. *See* Pl.'s Opp'n at 25–27. Tumblin provided her 2012–2016 performance appraisals in support of this claim. *See* Pl.'s Opp'n, Ex. 4, Teresa Tumblin Performance Appraisals, ECF No. 38-4. However, Tumblin does not allege that these performance appraisal reports were available to the panel. *See* Reply in Supp. of Def.'s Mot. for Summ. J. 22–23, ECF No. 39. And no record evidence indicates that they were available. *See* Def.'s Mot. for Summ. J., Ex. 30, Dep. of Kenneth G. Strother 63, ECF No. 37-32; Addendum for Achieving Results; Individual Rating Forms. Thus, "the [performance appraisal reports] in Exhibit [4] are not relevant to the non-selection decision because they were not considered separately by the [panel] when selecting the new [position]." *Youssef v. Lynch*, 144 F. Supp. 3d 70, 92 (D.D.C. 2015). Moreover, Tumblin's seventh-place ranking would be unchanged even if she had received 5s from the four panelists in the interpersonal ability category, raising her overall score to seventy. *See* Tumblin's Ratings; Rotational Board Final Decision at 2.

Three additional facts support Defendant's argument. First, Tumblin admits that selection to the one-year detail would not have resulted in a promotion or salary increase. *See* Pl.'s Opp'n at 49. Second, she acknowledges that she received an offer for the QA Reviewer rotational program nine months later when a vacancy arose for which her scoring made her an eligible candidate. *See* Email from Kevin Donovan to Teresa Tumblin. Third, when Donovan independently re-ranked the candidates based on different criteria, Tumblin once again ranked seventh out of eight. *See* NNCP QA Rotation Selections at 2–3. This was in part due to her "minimally successful" productivity score. *See* Addendum for Achieving Results at 2–4; Table of Applicants' Qualifications at 2. Taken together, this evidence further corroborates the "absen[ce of a] demonstrably [retaliatory] motive." *Fischbach*, 86 F.3d at 1183 (cleaned up).

Accordingly, summary judgment is appropriate. *See Clinton*, 2021 WL 1166737, at *9–11.

## IV. CONCLUSION

For the foregoing reasons, the Court will GRANT Defendant's Motion for Summary Judgment in an accompanying order.

Date: November 10, 2022

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE